IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MARCUS YANO, | ) | CIVIL NO. 11-00745 SOM/BMK |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER GRANTING DEFENDANT |
| vs. | ) | GOVERNMENT EMPLOYEES |
| | ) | INSURANCE COMPANY'S MOTION |
| GOVERNMENT EMPLOYEES | ) | FOR SUMMARY JUDGMENT AND |
| INSURANCE COMPANY, a Maryland | ) | DENYING PLAINTIFF MARCUS |
| corporation; DOES ONE through | ) | YANO'S MOTION FOR PARTIAL |
| ONE HUNDRED, inclusive, and | ) | SUMMARY JUDGMENT RE: |
| each of them; | ) | DECLARATORY RELIEF |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**ORDER GRANTING DEFENDANT GOVERNMENT EMPLOYEES INSURANCE COMPANY'S
MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF MARCUS YANO'S
MOTION FOR PARTIAL SUMMARY JUDGMENT RE: DECLARATORY RELIEF**

**I.      INTRODUCTION.**

This diversity case involves the question of whether

Plaintiff Marcus Yano ("Marcus") was covered by the uninsured

motorist ("UM") provisions of the automobile insurance policy his

father had with Defendant Government Employees Insurance Company

("GEICO").[1]  Two motions are before the court: GEICO's motion

seeking summary judgment on all claims against it, and Marcus's

motion seeking summary judgment with respect to his claim for

declaratory relief.

_____

[1] To avoid confusion because they all have the same
last name, the court refers in this order to Plaintiff and his
parents by their first names.

Marcus was injured in an accident.  Although renting his own apartment at the time, he sought UM benefits under his father's policy on the ground that he was related and a resident of his parents' household.  Concluding that Marcus was not covered by the policy, the court grants GEICO's motion and denies Marcus's motion.

**II.**      **STATEMENT OF FACTS.**

    **A.   Background Information.**

Marcus is the son of Michael and Jeanie Yano.  Born in 1979, Marcus grew up in his parents' home in Mililani on the island of Oahu.  After he married, Marcus lived with his first wife in their own place until he was deployed to Iraq with the Army National Guard.  By the time Marcus returned from Iraq in January 2006, he and his first wife were no longer together, and Marcus went back to living at his parents' home.  Tr. of Recorded Interview of Marcus Yano ("Marcus Interview") at 2-8, Def.'s Ex. 7, ECF No. 47-108.  For a few months, Marcus commuted from his parents' home to his job in downtown Honolulu.  Then, in the spring of 2006, he began renting an apartment closer to work. Marcus Interview at 4; see also Rental Agreement, Def.'s Ex. 2, ECF No. 47-5.

Renting his own apartment meant that Marcus had to pay rent of $700 per month.  He therefore could not save as much money toward his goal of purchasing his own home as he had been

able to do while living at his parents' home.  Marcus nevertheless considered the rent "worth avoiding the commute" between his parents' Mililani home and his job.  That commute could "at times take up to three hours round trip."  Pl.'s Aff. ¶¶ 14-17, ECF No. 51-1.

Even after he moved into his apartment on May 1, 2006, Marcus kept a key to his parents' home, where he "came and went freely."  Pl.'s Aff. ¶ 18, ECF No. 51-1.  His bedroom at his parents' room remained intact, with his bed, stereo, clothes, sports gear, computer, and military gear.  Id. ¶ 15.  Marcus visited his parents on most weekends, doing laundry, helping his father with yard work, showering, spending time with his parents, sometimes eating dinner there, and occasionally sleeping there. Id. ¶ 15-16.  Most of his "important mail" went to his parents' home, including his voter registration, driver's license, vehicle registration, health insurance, military, and employment information.  Id. ¶ 18.

On September 24, 2006, Marcus was riding his motorcycle when a car hit him.  Am. Compl. ¶ 6.  Marcus says his parents offered to have him to stay at their home while he was recuperating from his injuries, but he declined.  Am. Compl. ¶ 19.

Marcus filed a claim with the other driver's insurance company, Progressive Insurance Company, but the claim was denied

3

because the other driver's policy had lapsed.  <u>See</u> Letter from Progressive Denying Marcus's Claim, ECF No. 47-12.  Marcus's motorcycle was also insured by Progressive at the time of the accident, but he had no UM coverage.  Marcus Interview at 7, 12. At the time of the accident, Marcus also had two vehicles with underinsured coverage from USAA, but Marcus declined to indicate what, if any, contact he had with USAA concerning his accident. <u>Id.</u> at 12.

In early January 2008, Marcus submitted a claim for UM coverage under his father's insurance policy with GEICO.  <u>See</u> GEICO's Letter to Marcus, ECF No. 47-6.  GEICO responded with a letter stating that it was unable to confirm whether Marcus qualified for UM coverage as a resident relative of the named insured's.  <u>Id.</u>  GEICO interviewed Marcus with his attorney on March 17, 2008.  Def.'s Ex. 7, ECF No. 47-10.  On March 28, 2008, GEICO denied Marcus's UM claim on the ground that he was not covered by his father's policy.  Def.'s Ex. 4, ECF No. 47-7.

Marcus filed the present case on December 9, 2011.  On December 28, 2011, GEICO interviewed Michael Yano (Marcus's father) and Jeanie Yano (Marcus's mother).  Def.'s Exs. 5 and 65, ECF Nos. 47-8 and 47-9.

Marcus is now married, and he and his second wife have a child.  Tr. of Recorded Interview of Jeanie Yano ("Jeanie Interview") at 11, ECF No. 47-6.  Marcus moved straight from the

4

apartment he had been renting at the time of the accident to the
home he and his family now occupy.  Marcus Interview at 4.  Even
after he and his second wife had their son, Marcus kept some
belongings at his parents' Mililani home.  He still periodically
receives mail there.  Id. at 9-11.

    **B.   The GEICO Policy.**

    The GEICO policy in issue lists Michael, Marcus's
father, as the named insured and gives the Mililani home as his
address.  Def.'s Ex. 1, ECF No. 47-4.  The policy period ran from
May 1, 2006, to November 1, 2006.  Id.  The policy provides:

> Under the Uninsured Motorist coverage, we will pay
> damages for **bodily injury** caused by accident which
> the **insured** is legally entitled to recover from the
> owner or operator of an **uninsured motor vehicle** or
> **hit-and-run auto** arising out of the ownership,
> maintenance or use of that auto.

Def.'s Ex. 1 at pp. 13-14 (policy page numbers at the bottom of
the page), ECF 47-4.  The policy defines an "insured" as:

> (a) the individual named in the declarations and
> his spouse if a resident of the same household;
> (b) **relatives** of (a) above if residents of his
> household;
> (c) any other person while **occupying** an **owned
> auto;**
> (d) any person who is entitled to recover damages
> because of **bodily injury** sustained by an insured
> under (a), (b), and (c) above.

Id. at 13.

    Under the policy, a "relative" includes "any **person**,
other than **you**, living in **your** household who is related to you by

5

blood, marriage, or adoption." Id. at 7.  All references to

"you" and "your" refer to the policyholder and his spouse if a

resident of the same household.  Id. at 3.  The term "relative"

does not include "any *person* who is a named insured under any

other contract providing Hawaii personal injury protection

benefits."  Id.

Now before the court are motions by both parties taking

dueling positions as to whether Marcus was a resident relative

entitled to UM coverage under Michael's GEICO policy.[2]

III.     **SUMMARY JUDGMENT STANDARD.**

Summary judgment shall be granted when "the pleadings,

the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c).  One of the principal purposes of

summary judgment is to identify and dispose of factually

---

[2] Approximately an hour before the start of the hearing
on the present motions, the court received a call from Marcus's
attorney indicating that Marcus, his parents, and their insurance
expert wanted to testify at the hearing.  Marcus's attorney
indicated that the testimony would respond to the written
inclinations the court had issued as part of its usual practice
of informing litigants ahead of a hearing of the court's
preliminary view of the issues raised by a motion.  See
Inclinations, ECF. No. 77.  The court declined to receive
testimony, noting that summary judgment proceedings were premised
on the absence of factual questions, that the court's practice of
issuing inclinations in no way changed the nature of the
proceeding or expanded a party's rights, and that the time
reserved for the hearing was too short to allow live testimony.

unsupported claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  Accordingly, "[o]nly admissible evidence may be considered in deciding a motion for summary judgment."  Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 988 (9th Cir. 2006).  Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See Celotex, 477 U.S. at 323.  A moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden initially falls on the moving party to identify for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323); accord Miller, 454 F.3d at 987.  "A fact is material if it could affect the outcome of the suit under the governing substantive law."  Miller, 454 F.3d at 987.

When the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything."  In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything.  Nissan Fire, 210 F.3d at 1102-03.  On the other hand, when the moving party meets its initial burden on a summary judgment motion, the

"burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial." Miller, 454 F.3d at 987.  This means that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).  The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial." Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000) ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

On a summary judgment motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." Miller, 454 F.3d at 988 (quotations and brackets omitted).

8

IV.        ANALYSIS.

    A.   General Law Governing Insurance Contracts.

Federal courts sitting in diversity apply state substantive law and federal procedural law.  See Snead v. Metro. Prop. & Cas. Ins. Co., 237 F.3d 1080, 1090 (9th Cir. 2001).  When interpreting state law, a federal court is bound by the decisions of a state's highest court.  Ariz. Elec. Power Coop. v. Berkeley, 59 F.3d 988, 991 (9th Cir. 1995).  In the absence of a governing state decision, a federal court attempts to predict how the highest state court would decide the issue, using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.  Id.; see also Burlington Ins. Co. v. Oceanic Design & Constr., Inc., 383 F.3d 940, 944 (9th Cir. 2004) ("To the extent this case raises issues of first impression, our court, sitting in diversity, must use its best judgment to predict how the Hawaii Supreme Court would decide the issue." (quotation and brackets omitted)).

Under Hawaii law, general rules of contract construction apply to the interpretation of insurance contracts. Dawes v. First Ins. Co. of Haw., 77 Haw. 117, 121, 883 P.2d 38, 42 (1994).  Hawaii law requires that an insurance policy be read as a whole and construed in accordance with the plain meaning of its terms, unless it appears that a different meaning is intended.  Id. at 121, 883 P.2d at 42; First Ins. Co. of Haw. v.

<u>State</u>, 66 Haw. 413, 423, 665 P.2d 648, 655 (1983); <u>see</u> <u>also</u> Haw. Rev. Stat. § 431:10-237 ("Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy").

Because insurance contracts are contracts of adhesion, they must be construed liberally in favor of the insured, and any ambiguity must be resolved against the insurer.  Put another way, policies are to be construed in accordance with the reasonable expectations of a layperson.  <u>Dawes</u>, 77 Haw. at 131, 883 P.2d at 42.

The burden is on the insured to establish coverage under an insurance policy.  <u>See</u> <u>Sentinel Ins. Co. v. First Ins. Co. of Haw.</u>, 76 Haw. 277, 291 n.13, 875 P.2d 894, 909 n.13 (1994) (as amended on grant of reconsideration).  The insurer has the burden of establishing the applicability of an exclusion.  <u>See</u> <u>id.</u> at 297, 875 P.2d at 914.

**B.   UM Coverage.**

Insurers in Hawaii are required to offer consumers the opportunity to include in their motor vehicle insurance policies coverage that provides benefits if they are involved in accidents with owners or operators of uninsured motor vehicles.  Haw. Rev. Stat. § 431:10C-103(b)(3).  A consumer may opt to reject UM coverage.  <u>Id.</u>

10

The Hawaii Supreme Court has made clear that "either an insured or an insured vehicle must be involved in the accident in order to collect under the UM endorsement.  This is because the uninsured motorist policy is personal to the insured, or, put differently, the UM coverage follows the insured's person." Dawes, 77 Haw. at 123-24, 883 P.2d at 45. "[T]he purpose of UM coverage in this State is for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury." Waddell v. Gov't Emps. Ins. Co., 2007 WL 2045681, at *2 (Haw. Ct. App. 2007)(quoting Haw. Rev. Stat. § 431:10C-301(b)(3)).

The term "insured" as used in Hawaii's insurance statutes means (1) the individual named on the policy, and (2)"[a] person residing in the same household with a named insured." See Haw. Rev. Stat. § 431:10C-103.  For the purpose of construing the insurance statutes, "A person resides in the same household if the person usually makes the person's home in the same family unit . . . even though the person temporarily lives elsewhere." Id.

The Hawaii Supreme Court has addressed a variety of "resident relative" provisions in different insurance policies and different familial contexts.  Because the question of whether a person qualifies as a resident relative can arise in a

multitude of circumstances, the Hawaii Supreme Court has carefully cabined the scope of its rulings and explicitly rejected the notion that subsequent Hawaii Supreme Court decisions necessarily supersede earlier decisions on the "resident relative" question that are based on different circumstances.  See Mikelson v. United Serv.s Auto. Ass'n, 107 Haw. 192, 205, 111 P.3d 601, 614 (2005).

### C.   Marcus is Not a Resident Relative Under the UM Provisions of His Parents' Policy.

Marcus argues that he qualifies as a resident relative entitled to UM benefits under Michael's policy because he is in a situation very similar to that of the claimant in Mikelson.  The Hawaii Supreme Court held that that claimant, even though physically living away from his father, fell under his father's policy.

The claimant in Mikelson was a University of Hawaii student who, while riding a motorcycle on Kamehameha Highway, was in an accident involving a car driven by an uninsured motorist. The student claimed that he fell under the resident relative provision of the UM coverage in a policy issued to his father, who lived in California.

The Hawaii Supreme Court held that the student did indeed qualify for coverage as a resident relative despite living in a different state from his father.  The student was only "temporarily absent from his Father's home while attending

12

college in Hawai'i at the time of the accident." <u>Id.</u> at 205, 111 P.2d at 614. The student maintained a room at his father's house, where he had left most of his possessions, having traveled to Hawaii with only clothing and a surfboard. <u>Id.</u> at 203, 111 P.2d at 612. After the accident, he returned to his father's home in California to recover from his injuries, intending to resume his studies at the University of Hawaii at a later time. <u>Id.</u> at 194, 111 P.2d at 603. The student had a California driver's license that listed his father's California home as the student's address. The student was unemployed and completely dependent on his father financially, including for education and travel, and the father listed the student as a dependent on tax returns. <u>Id.</u> at 194, 203, 111 P.2d at 603, 612. Pointing to several circumstances he says mirror those of the student in <u>Mikelson</u>, Marcus asserts that he too falls under his father's UM coverage.

This court is not persuaded. A review of other Hawaii Supreme Court cases makes it clear that what is paramount for resident relative purposes is a claimant's intent to be a member of the named insured's household. Just having some of the circumstances that the son in <u>Mikelson</u> had is not enough. It is for that reason that several individuals in other Hawaii cases who lived apart from named insureds could not qualify as resident relatives entitled to insurance coverage.

13

In Mun Quon Kok v. Pacific Ins. Co., 51 Haw. 470, 471, 462 P.2d 909, 911 (1969), the question was whether a father was an insured under the UM provisions of a policy issued to his son. The policy defined "insured" to mean "the named insured and any relative." It defined "relative" as "a relative of the named insured who is a resident of the same household." The father rented a room in Chinatown. The son, who lived in a different place, took two meals a day to his father at the Chinatown rooming house. The father received his mail at the son's home, and the son delivered the mail to his father. The court did not consider the father to be a resident of the son's household, noting that "there was no showing of temporary absence, no showing that appellant ever lived at named insured's residence, no showing of support beyond two meals a day." Id. at 471, 462 P.2d at 911. While "actual residence under a common roof is not an absolute requirement" for an individual to qualify as a resident of the same household as the named insured, the court had no trouble concluding that "[t]here simply are not enough facts to justify finding that appellant was a resident of the same household as the named insured." Id.

The Hawaii Supreme Court also held that the claimant in AIG Hawaii Insurance Co. v. Estate of Caraang, 74 Haw. 620, 851 P.2d 321 (1993), was not covered. That case involved liability coverage provisions in an automobile policy that listed Bonifacio

14

and Cathy Godinet as named insureds.  Bonifacio Godinet was Ilmar
Godinez's father.  While Ilmar, who regularly drove Bonifacio's
truck, was giving a ride to Vilamor, Vilamor fired a gun at the
driver of another vehicle with whom Vilamor had a dispute,
killing that other driver.  The family of the deceased sued Ilmar
Godinet and Vilamor, and Bonifacio's insurer challenged the
applicability of Bonifacio and Cathy Godinet's policy to Ilmar
and Vilamor.  This court focuses on the court's discussion
concerning Ilmar

The policy provided coverage to (1) the named insureds,
(2) "any family member for the ownership, maintenance or use of
any auto," and (3) any person using a covered auto with a named
insured's permission.  The Hawaii Supreme Court held that Ilmar
Godinet qualified under the third provision but not the second.
The term "family member" in the second provision was defined as
"a person related to [the named insureds] by blood, marriage or
adoption who is a resident of [the named insureds'] household,
including a ward or foster child."  Id. at 326, 851 P.2d at 629-
30.  The court noted that Ilmar was related to Bonifacio by blood
but lived with his biological mother, who was neither a named
insured nor related to a named insured by blood, marriage, or
adoption or living in a named insured's household.  Ilmar
therefore did not qualify as Bonifacio's or Cathy's "family
member."  Id., 851 P.2d at 629-30.

The United States District Court for the District of Hawaii has also had occasion to examine whether, under Hawaii law, a husband who had lived in a different state from his wife for years and was not physically living with her at the time of an automobile accident qualified for insurance benefits under her policy. The wife's policy in <u>Tirona v. State Farm Mutual Automobile Insurance Company</u>, 812 F. Supp. 1083 (D. Haw. 1993), included her "spouse" as an "insured." A "spouse" was defined as the named insured's "husband or wife while living with" the named insured. <u>Id.</u> at 1087. The court concluded that the claimant and his wife had separate households that did not entitle the claimant to coverage under his wife's policy. <u>Id.</u> at 1089.

<u>Mikelson</u> is the only one of the above cases that concludes that related persons living apart are in fact residents of the same household. Although Marcus repeatedly urges this court to rely also on <u>Park v. Government Employees Insurance Company</u>, 89 Haw. 394, 974 P.2d 34 (1999), the claimant in <u>Park</u> indeed lived with the named insured. Park lived in a house with his parents, Park's niece, and the niece's husband, Findlay. There was "no showing of physically separate living conditions." <u>Id.</u> at 397, 974 P.2d at 37. Park sought underinsured motorist benefits under Findlay's policy, contending that he qualified as an "insured" under Findlay's policy, which included "relatives" as insureds. The term "relative" was defined in Findlay's policy

16

as "a person related to you who resides in your household."  The court held that Park qualified as Findlay's relative.  Id. at 35, 38, 974 P.2d at 395, 398.

Marcus asks the court to focus on the recognition in Park of the concept of `ohana, a concept Marcus sees as relevant to what he says is his status as a member of his parents' household.  It is true that the Park decision, citing Leong v. Takasaki, 55 Haw. 398, 410, 520 P.2d 758, 766 (1974), refers to the practice among Hawaiian and Asian families in Hawaii of preserving strong ties within their extended families.  However, while the concept of `ohana is not always limited to residents of the same household, the specific example the Park decision points to involves "members of three and even four generations, living under one roof as a single family."  Id., 520 P.2d at 766 (emphasis added by Park to quote from Leong).  The court said, "We therefore interpret the 'reasonable expectations of a layperson' in Hawaii as an expectation that family members, living in the same residence, are considered members of the same household for the purposes of insurance coverage."  Id., 974 P.2d at 398.  The Hawaii Supreme Court in Park did not rely on the concept of `ohana to cover the situation of relatives not living in the same residence.

The reason coverage was found in Mikelson was that the son in that case, unlike the claimants in Kok, Caraang, and

17

<u>Tirona</u>, intended to return to the insured's residence, from which the son was only temporarily absent.  Nothing in the other cases suggests that the claimants in those other cases were only temporarily absent from the named insureds' homes or that they intended to live in the same household with the insureds.  Those claimants were not, for example, college students away for finite periods, or members of the military on tours of active duty.

Marcus submits no express statement of his own that, at the time of the accident, he intended to return to live with his parents.  His affidavit is silent in that regard, as is the transcript of his interview by GEICO.  The court is left to glean from the circumstances of his life what his intent was.  The circumstances he identifies for this court's consideration are insufficient to demonstrate that, at the time of the accident, he was a resident of his parents' household.

Clearly, Marcus was welcome at his parents' home.  He visited his parents with some frequency, came and went as he pleased, spent time with his parents, ate meals with them, did laundry at their home, and sometimes even slept there.  His parents appear to have been consistently generous and supportive, but not part of the same household as Marcus at the time of his accident.  Indeed, Marcus declined their offer that he stay at their home to recover from the injuries he sustained in the accident.  He preferred to stay at his own apartment.

18

Unlike the college student in <u>Mikelson</u>, Marcus was not just temporarily living on his own.  Nor was Marcus financially dependent on his parents.  He had a job, paid rent on his apartment, owned a motorcycle and several other vehicles, and was saving toward the purchase of his own home.

There is no evidence that the reason Marcus's bedroom was unchanged at his parents home and that he kept many belongings there was that he intended to live in his parents' house.  To the contrary, Jeanie said in her interview that his bedroom and belongings remained untouched long after Marcus married for the second time, had a son, and purchased his own home.  Thus, Marcus appears to have used his parents' home as a convenient and cost-free storage place for his belongings, not just while renting a small apartment, but even after he himself would be forced to admit he had a separate household.  His bedroom and belongings therefore cannot be said to indicate an intent on his part to return to live in his parents' home.

Similarly, Marcus's receipt of mail and use of his parents' address do not signify his intent to be part of his parents' household.  When interviewed in 2011, which was after Marcus had remarried, had a child, and bought his own home, Marcus's mother said that Marcus still received mail at her home. This indicates that Marcus used his parents' home and address simply as a convenience that freed him from the nuisance of

processing address changes while renting an apartment in anticipation of yet another address change when he had saved enough money to buy his own home.  His parents' home functioned like a post office box.  Marcus was not just temporarily away from his parents' home while receiving mail there.  The only thing that was temporary was Marcus's own separate address.  But having a temporary separate address in no way indicated an intent to return to living with his parents.

Marcus takes the position that Hawaii law allows a person to have two residences simultaneously.  Thus, he argues, this court should view Marcus as residing simultaneously both at his parents' home and at his apartment, not as having moved out of his parents' home or as needing to show an intent to return there.  Marcus claims never to have left his parents' home.  This contention finds no support in the record.  There is, for example, no evidence that Marcus treated household bills at both his apartment and his parents' home the same way, or felt equally at home in both places.  There is certainly evidence that he was very comfortable in his childhood home.  He stored belongings there, had mail sent there, felt free to visit.  But if that were enough to make him a resident of his parents' household, he would be considered a resident relative to this day!  Not even Marcus claims that he is covered by his parents' policy today.  Marcus's situation is a far cry from that in Mikelson.

20

Because Marcus is not entitled to a declaration by this court that he was an "insured" under Michael's policy, the court denies Marcus's motion seeking such a declaration and grants summary judgment to GEICO on Marcus's First Cause of Action (Declaratory Judgment).

**E.    GEICO is Entitled to Summary Judgment on Marcus's Other Claims.**

Marcus asserts numerous other claims, but none raises a triable issue.

The Second Cause of Action purports to be a negligence claim and alleges a breach of duty by GEICO.  However, the duty that Marcus identifies is the duty "to timely accept Plaintiff's UM claim under his parents' GEICO policy."  First Am. Compl. ¶ 27, ECF No. 1-1.  Notwithstanding its reference to negligence, the Second Cause of Action is a breach of contract claim that mirrors the request for declaratory relief in the First Cause of Action.  Like the First Cause of Action, the Second Cause of Action fails.

The Third Cause of Action asserts a breach of contract and/or contractual warranties.  It complains that GEICO "failed to offer Plaintiff UM insurance coverage arising from the subject collision as required by Mikelson v. USAA."  Id. ¶ 34.  Given this court's conclusion that Marcus is not entitled to coverage under Mikelson, the Third Cause of Action also fails.

The Fourth Cause of Action asserts that GEICO committed unfair and deceptive trade practices in violation of section 480-2 of Hawaii Revised Statutes, while the Fifth Cause of Action asserts breaches of the covenant of good faith and fair dealing. To the extent these claims are premised on the proposition that the mere denial of coverage was a violation of section 480-2 or of the covenant of the good faith and fair dealing, they fail, because GEICO's denial was grounded in law.

The claims continue to fail even if premised on any alleged bad faith mishandling of Marcus's claim.  (In referring in his papers to "bad faith," Marcus is presumably viewing his Fifth Cause of Action as a bad faith claim.)  No bad faith claim is cognizable under the facts of this case.

As evidence of bad faith, Marcus points to GEICO's interviews of his parents.  Marcus complains about the timing and manner of the interviews.  The interviews occurred after this lawsuit was filed, without notice to his counsel, and included what Marcus views as unfair questions.  Marcus cites no law suggesting that the pendency of litigation prevents an insurer from interviewing a named insured who is not a party to that litigation and is not represented by counsel.  It is unclear on what basis he is contending that his attorney should have been notified about interviews of his parents that Marcus characterizes as tantamount to depositions.  In cases involving

insurers as well as in cases in unrelated contexts, attorneys frequently interview potential trial witnesses without notice to an opposing party and without taking depositions.  Marcus's own attorney obtained affidavits from Marcus's parents outside of any deposition context.  Marcus does not explain why an insurance claims agent is more restricted than an attorney would be.  It is simply not the law that, once litigation begins, contact with potential witnesses is barred in the absence of opposing counsel.  Nor does the law say that unrepresented nonparty witnesses may only be spoken with during depositions, or that interviews taken long after an accident are forbidden.

Even if there were some impropriety connected with the interviews, Marcus does not even hint at why he should be allowed to sue GEICO over them.  He does not identify a response by his parents during the interviews that was incorrect.  In fact, nothing in the affidavits his parents have submitted to this court contradicts anything they said in their interviews.  In short, the interviews cannot be said to have caused Marcus to suffer any cognizable injury.

Similarly unredressable is GEICO's alleged failure to fully investigate Marcus's claim before denying coverage.  Marcus does not show that, had GEICO conducted what he would deem to have been a satisfactory investigation, GEICO's decision would have been different.  Moreover, an insufficient investigation is

23

not, without more, bad faith.  The court is not finding that GEICO's investigation was insufficient, but even if that were the case, the insufficiency could be mere sloppiness, not bad faith. As the party who would have the burden of proving bad faith if that claim went to trial, Marcus had the burden of coming forth with evidence that he was injured by GEICO's alleged mishandling of its investigation.  There is a complete failure to prove injury.  In fact, Marcus confusingly appears to be arguing that GEICO did too much (e.g., by interviewing his parents) while also doing too little.

The court's analysis of what Marcus identifies as bad faith is entirely consistent with the Hawaii Supreme Court decisions Marcus cites.  Enoka v. AIG Hawaii Insurance Co., Inc., 109 Haw. 537, 128 P.3d 850 (2006), holds that an insured may sue an insurer for bad faith mishandling of the insured's claim even if the insurer was not obligated to pay the insured any benefits. But Enoka does not stand for the proposition that the kind of things Marcus complains about constitute bad faith for which Marcus may recover damages.

As the Hawaii Supreme Court said in Miller v. Hartford Life Insurance Co., 126 Haw. 165, 176, 268 P.3d 418, 429 (2011), its decisions evidence "an intent to provide the insured with a vehicle for compensation for all damages incurred as a result of the insurer's misconduct, including damages for emotional

24

distress, without imposing a threshold requirement of economic or physical loss." But there still must be evidence of the bad faith mishandling of a claim. "[B]efore the issue of damages (emotional distress and others) may be considered, the plaintiff must first prove liability for bad faith . . . . The burden of proof for bad faith liability is not insubstantial." Id. at 178, 268 P.3d at 431. And there must be evidence of a resulting injury of some sort. Marcus presents evidence of neither liability nor injury.

Finally, Marcus's Sixth Cause of Action (Negligent and/or Intentional Infliction of Emotional Distress) and Seventh Cause of Action (Punitive Damages) are derivative claims. That is, Marcus may only proceed with them if he prevails on a substantive claim. As Marcus's other claims fail, the Sixth Cause of Action and the Seventh Cause of Action also fail. The court notes that the Sixth Cause of Action additionally fails because, while seeking summary judgment, Marcus provides no evidence at all that he has actually suffered serious emotional distress.

## V.    CONCLUSION.

The court denies Marcus's motion for partial summary judgment and grants GEICO's motion for summary judgment on all claims. The Clerk of Court is directed to enter judgment for GEICO and to close this case.

25

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, October 17, 2012.



 /s/ Susan Oki Mollway 
Susan Oki Mollway
United States District Judge

Marcus Yano v. GEICO, CIVIL NO. 11-00745 SOM/BMK; ORDER GRANTING DEFENDANT GOVERNMENT EMPLOYEES INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF MARCUS YANO'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE: DECLARATORY RELIEF